**United States District Court**
For the Northern District of California

1

2

3

4

5

6               IN THE UNITED STATES DISTRICT COURT

7

8               FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   JULIO R. AYALA and MIRNA AYALA,              No. C 06-02061 WHA
     individually and as Administrators of the
11   Estate of Julio A. Ayala,

12              Plaintiffs,                        **ORDER GRANTING IN PART
                                                   AND DENYING IN PART
13        v.                                       MOTION FOR SUMMARY
                                                   JUDGMENT**
14   CITY OF SOUTH SAN FRANCISCO,
     SOUTH SAN FRANCISCO POLICE
15   DEPARTMENT, CHIEF MARK
     RAFFAELLI, OFFICER MIKE KUCHAC,
16   OFFICER JANELLE PEREZ, CORPORAL
     BRUCE McPHILLIPS, OFFICER DAVID
17   BERRY, CORPORAL DANNY GIL,
     OFFICER MELINDA LOPEZ, CORPORAL
18   KEN CHETCUTI, SERGEANT RON
     CARLINO, CORPORAL DAVE KENNAN,
19   OFFICER CHRIS DEVAN, OFFICER MATT
     McNICHOL, OFFICER ADAM PLANK,
20   OFFICER ROBBY CHON, and DOES 1 to 50,
     inclusive,
21
                Defendants.
22   _____/

23

24                            **INTRODUCTION**

25        In this civil-rights action, defendants move for summary judgment.  Plaintiffs bring

26   several federal and state-law claims on behalf of their decedent son.  Defendants have failed to

27   eliminate all triable issues of fact in plaintiffs' Section 1983 claims under the Fourth and

28   Fourteenth Amendments and plaintiffs' state-law claims for wrongful death, assault and battery,

     and negligence against defendants.  Defendants have demonstrated that there are no triable

United States District Court

For the Northern District of California

1    issues of fact remaining in plaintiffs' *Monell* claims and state-law claims for negligence and

2    negligent hiring, supervision, and training against the City of South San Francisco, Carlino and

3    Rafaelli.  Accordingly, defendants' motion for summary judgment is **GRANTED IN PART AND**

4    **DENIED IN PART**.

5                                    **STATEMENT**

6            Plaintiffs Julio R. Ayala and Mirna Ayala were the parents of decedent Julio A. Ayala.

7    Defendants Chief of Police Mark Raffaelli, Officer Mike Kuchac, Officer Janelle Perez,

8    Corporal Bruce McPhillips, Officer David Berry, Corporal Danny Gil, Officer Melinda Lopez,

9    Corporal Ken Chetcuti, Sergeant Ron Carlino, Corporal Dave Kennan, Officer Chris Devan,

10   Officer Matt McNichol, Officer Adam Plank, and Officer Robby Chon were South San

11   Francisco police officers alleged to be involved with decedent's death.  The City of South San

12   Francisco was also named as a defendant.

13           On the evening of April 3, 2005, 26-year-old Julio A. Ayala was in a hotel room in

14   South San Francisco.  The people in the room next door, Veronica Vargas and Pedro Escobar,

15   placed a 911 call shortly before midnight (Hynes Decl. Exh. A-2, 28:9–21).  They had heard

16   sounds of someone in the next room banging against the walls and kicking the door.  They

17   feared that the person in the next room would break through their door.  Vargas placed the call

18   and relayed this information to the police (*id*. at Exh. A-1, 13:10–15).  Vargas and Escobar

19   testified in their deposition that they were very afraid at the time, so they made the 911 operator

20   stay on the line with them (*id*. at A-2, 30:16–20).  Vargas did not actually see Ayala or any of

21   the events that transpired after the police arrived (Sarmiento Decl. Exh. 8, 28:14–20; 38:9–12).

22   Escobar also testified that he did not know exactly what was happening in the other room and

23   that he had not seen anything (*id*. at Exh. 9, 40:4–7).

24           Other than the police officer defendants, there were no other surviving witnesses.

25   Officers Mike Kuhac and Janelle Perez were the first to respond, arriving at around 12:20 a.m.

26   Primarily from radio dispatch, Kuhac learned that the caller was complaining that someone in

27   the hotel was screaming and knocking on hotel room doors (*id*. at Exh. 1, 12:1–4).  Perez

28   testified at her deposition that she had received similar information and did not know if there

United States District Court

For the Northern District of California

1   was a felony or other crime in progress (*id*. at Exh. 2, 39:2–15).  Neither officer testified that

2   they had any prior dealings with or knowledge of decedent (*id*. at Exh. 1, 12:19–25; Exh. 2.

3   34:1–11).

4        When Kuhac and Perez first encountered Ayala, the door to his hotel room was open,

5   and Ayala was wearing only socks (*id*. at Exh. 1, 12:16–18).  Kuhac stood in the door of the

6   hotel room, and Ayala approached him.  It was at that time that Kuhac first developed the

7   impression that Ayala was on PCP because he appeared sweaty, aggressive, and agitated (*id*. at

8   21:5–22:1).  Kuhac also testified that Ayala did not appear to have been the victim of a crime,

9   did not appear to be injured, did not appear to have committed any crimes against anyone else,

10  and did not try to punch, kick, or grab Kuhac or Perez (*id*. at 23:1–20).  Kuhac did not ask

11  Ayala any questions regarding the disturbance (*id*. at 24:11–15).  Kuhac testified that he

12  determined at that time that he should arrest Ayala for being under the influence or for a "5150"

13  — being a danger to himself (*id*. at 25:13–20).

14       Shortly thereafter, Corporal Bruce McPhillips and Officer David Berry arrived.  Kuhac

15  contemplated using pepper spray on Ayala.  McPhillips counseled against doing so.  Because of

16  the close quarters in the hotel room, the officers too could have been affected (*id*. at

17  26:21–27:7).  McPhillips and Berry testified in their depositions that they agreed with Kuhac's

18  assessment that Ayala was on PCP (Hynes Decl. Exh. F, 39:13–24, Exh. G, 24:17–19).

19        Ayala was not responding to the officers' commands, so they formulated a plan to bring

20  him into custody.  The discussions occurred in front of Ayala and he did not appear to

21  comprehend what was happening (*id*. at 46:14–24).  Eventually, the officers decided that Kuhac

22  would grab Ayala's right arm and Berry would grab his left arm, and they would pull him into

23  the hallway where the officers would attempt to put Ayala in handcuffs (*id*. at Exh. G, 30:1–8;

24  Exh. F, 47:11–18).  Ayala's arms slipped though their grasp because he was sweating and

25  wearing no clothes.  The officers then attempted to tackle Ayala to the ground.  Kuhac testified

26  that he estimated that within three to five minutes of taking him to the ground, Ayala was

27  handcuffed with his hands above his head (Sarmiento Decl. Exh. 2, 40:11–17).  The officers

28  were not able to cuff Ayala's hands behind his back.  Ayala could still pull his arms beneath

3

United States District Court

For the Northern District of California

1   him and plant his hands on the ground to lift up his torso (Hynes Decl. Exh. F, 64:20–65:4).

2   Ayala was face down and the officers applied pressure to parts of his body to prevent him from

3   moving. Berry was positioned near Ayala's head, and admits to hitting him three or four times

4   in the face, as well as grabbing a fistful of Ayala's hair (Sarmiento Decl. Exh. 3, 28:7–22).

5         Corporal Danny Gil and Officer Melinda Lopez arrived together in response to the

6   dispatch call (*id*. at Exh. 5, 47:5–25). Shortly after he arrived, Gil heard McPhillips call for

7   Code 3 cover, meaning that all available units should respond to the location with their

8   emergency equipment (*id*. at 50:4–14). While the officers were holding him, Ayala attempted

9   to kick his legs and Perez applied pressure to try to prevent him from moving (Hynes Decl. Exh.

10  F 68:2–7). Ayala was growling and muttering in a mix of English and Spanish while the

11  officers held him down (*id*. at Exh. G, 48:24–49:2). Gil suggested that the officers should place

12  Ayala in a body wrap. The other officers agreed. Gil then put out a call on the radio requesting

13  that the officer who had the wrap should bring it to the hotel (Sarmiento Decl. Exh. 5, 69:3–12).

14  A "body wrap" consisted of a shoulder harness, a binding for the ankles, and a blanket with

15  straps that encircled and restrained the legs (Hynes Decl. Exh. E, 38:12–40:12). The harness

16  and the ankle straps attached to loops on the blanket using carabiners which helped prevent

17  captives from moving. Before asking that the wrap be brought, Gil did not ask if a crime had

18  taken place, and his view of Ayala was obscured by the officers applying pressure to subdue

19  him (*id*. at 54:3–55:4, 70:12–16). Gil also punched Ayala at least one time with a closed fist

20  (*id*. at 71:12–23).

21        After that, Officers Chris Devan and Adam Plank, Corporals Ken Chetcuti and Dave

22  Kennan, and Sergeant Ron Carlino were the next to arrive. Carlino had the body wrap. At the

23  time, the officers were switching off applying pressure and distraction blows in an attempt to

24  subdue Ayala. From deposition testimony, it appears that anywhere from four to six officers

25  were holding Ayala down at any given time. Carlino testified that Ayala did not appear to

26  respond or react consciously to any of the officers' orders or efforts to subdue him (*id*. at Exh.

27  H. 108:18–25).

28

Then, Corporal Schwartz and Officer Matt McNichol arrived.  Some of the officers began administering more "distraction blows" using their hands and knees (*id*. at Exh. I, 56:7–23; Exh. J, 124:15–18, 125:12–14).  Ayala still did not respond or cooperate, though none of the officers testified that he ever attempted to hit or kick them, and Ayala never attempted to take any officer's weapons.

The officers then formulated a plan to use the carotid hold on Ayala (Hynes Decl. Exh. J 172:10–23).  Carlino testified that the decision was made by himself, Kennan, Kuhac, Gil, and McPhillips (*id.* at Exh. H, 88:3–23).  McNichol testified at deposition that he was uncertain who actually made the decision, although he recalled hearing the discussions (*id*. at Exh. K, 64:5–15).  Gil testified that he thought Carlino had formulated the plan.  The officers intended to apply the carotid hold, undo Ayala's handcuffs and reposition them to place his hands behind his back, and then place Ayala in the body wrap (Sarmiento Decl. Exh. 5 81:19–82:24).  The officers had called for paramedics to be downstairs in the hotel earlier (Hynes Decl. Exh. H, 146:17–147:1).

Before the carotid restraint was applied, Perez secured the body wrap's ankle straps around Ayala's ankles (Sarmiento Decl. Exh. E, 101:2–16).  Kennan applied the hold while straddling Ayala's back (Hynes Decl. Exh. M, 84:24–85:4).  Regarding the manuever's application, Kennan testified (*id*. at Exh. J, 211:1–10, Sarmiento Decl. Exh. 6, 230:1–231:3):

> Q.    How long did you apply the carotid?
>
> A.    I remember when I first started the application, Mr Ayala was turning his head too much and I released it.  I didn't completely released [sic] it.  I just lessened the pressure.  But once I thought he had — he stopped fighting enough for me to get it back in position — I remember I had to do that a couple of times.  Two or three times.  I don't remember exactly how many times.  But as far as the actual application, I can't remember.  I don't know exactly . . . .
>
> Q.    Did you stop the carotid because you believed the carotid had gone into effect?
>
> A.    I stopped it because — I did not know if it had taken effect.  But we were at the point where he was relaxed enough to be handcuffed, and that was enough for me.

United States District Court
For the Northern District of California

| | | |
|---|---|---|
| 1 | Q. | And how did you know he was relaxed enough to be handcuffed?  Is that based on you feeling or based on what someone was telling you? . . . |
| 2 | | |
| 3 | A. | Based on him being handcuffed and my [extension] cord [connecting Kennan's radio to a microphone] being stuck between his handcuffs. |
| 4 | | |
| 5 | Q. | Did you feel him relaxing as he was being handcuffed? |
| 6 | A. | I don't remember the exact point where he — where he was handcuffed. |
| 7 | | |
| 8 | Q. | While he was being handcuffed, were you still in position of the carotid?  Was your arm still aligned with the chin or just below his chin around his neck? |
| 9 | | |
| 10 | A. | I don't remember.  I do remember focusing on my radio. |
| 11 | Q. | Were you still applying pressure when he was being handcuffed? |
| 12 | A. | I don't know. |

Carlino and McPhillips testified that they were monitoring Kennan's application of the hold while it occurred (Hynes Decl. Exh. H, 101:22–102:11, Exh. F, 20:3–16).  The testimony is unclear on how long the carotid was applied.  Kennan was uncertain of how long he applied the carotid hold, although he did testify that the entire process of handcuffing Ayala took less than five minutes (Sarmiento Decl. Exh. 6, 232:20–233:8).  Carlino testified that he thought that Kennan had applied the carotid hold for around ten seconds (*id*. at Exh. 11, 96:8–13).  Kennan gave no signal to the other officers to denote when he had finished administering the carotid hold (*id*. at 96:19–24).

Lopez then secured Ayala into the body wrap (*id*. at Exh. 4, 114:4–115:22).  While he was being placed in the body wrap, some of the officers thought they heard sounds like snoring or agonal breathing coming from Ayala.  After Lopez had finished securing the top part of the wrap, she then checked Ayala for a pulse (*id*. at 119:8–14).  None of the officers could find a pulse, and the paramedics were unable to revive him.

An autopsy was performed on Ayala by Dr. Thomas Rogers.  He testified that he noted petechial hemmorrhages, fluidity of blood, cerebral swelling, pulmonary congestion, edema, and visceral organ congestion which he believed to be consistent with asphyxia (Sarmiento

1  Decl. Exh. 7, 23:7–27:23). Dr. Rogers also found a fracture of Ayala's left superior horn of his

2  thyroid cartilage and a fracture of one of his right ribs (*id.* at 35:6–13, 41:7–13). Dr. Roger's

3  autopsy report listed the cause of death by a blunt injury to the neck associated with physical

4  exertion and cocaine intoxication (*id.* at Exh. 4).

5        As the highest ranking officer present, Carlino was the supervisor during the incident

6  (*id.* at Exh. 11, 23:1–8). Carlino testified that he considered use of the carotid restraint to be

7  something less than deadly force (*id.* at 28:3–19). In his deposition, he identified tracheal injury

8  and risk associated with certain types of people as risks involved in the use of the carotid

9  restraint (*id.* at 34:5–25). Carlino was unfamiliar with risks associated with using the carotid

10  restraint on people under the influence of stimulants or using the restraint in conjunction with

11  the body wrap.

12        In his deposition, Kennan did not recall any training he had received in the police

13  academy regarding the use of the carotid hold (*id.* at Exh. 6, 33:13–20). He also did not recall

14  receiving training regarding the carotid hold before the incident (*id.* at 38:2–10). Kennan also

15  testified that he was trained in the mechanics of applying the carotid restraint but not when it

16  was an appropriate technique to subdue a suspect (*id.* at 43:12–25). He was unaware of risks

17  associated with asphyxiation and injuries to subjects who turn their heads while the carotid is

18  being administered (*id.* at 99:4–22).

19        General Order U-01 addresses the use of the carotid restraint by the South San Francisco

20  Police Department (*id.* at Exh. 2). It states that "carotid restraints are to be employed only in

21  those situations that require the immobilization of a combative and dangerous subject" and that

22  "the carotid hold shall only be utilized by those officers who have been properly trained to do

23  so."

24                        *              *              *

25        This action was filed on March 17, 2006. The complaint alleged three claims under

26  federal law. Plaintiffs claimed that the officers used excessive force on decedent in violation of

27  the Fourth Amendment, and that doing so violated plaintiffs' Fourteenth Amendment rights.

28  They also alleged a pattern or practice of the use of excessive force against Latinos,

African-Americans, and other minorities in violation of 42 U.S.C. 1983.  Their final federal

claim alleged that the City, Chief of Police Rafaelli, and Sergeant Carlino were liable for Fourth

and Fourteenth Amendment violations for a failure to train and supervise the other officers

properly.  The complaint also alleged state-law claims for wrongful death, a survival action, and

negligence against all defendants, and negligent hiring, retention, and supervision against

Rafaelli and the City of South San Francisco.

Defendants filed a motion to dismiss which was granted in part and denied in part on

August 28, 2006.  The order held that plaintiffs had not sufficiently alleged constitutional

violations of the Fourth and Fourteenth Amendment rights of minorities in general.  Plaintiffs

could, however, maintain an action on behalf of decedent for all of their asserted claims.  This

motion for summary judgment was filed on June 6, 2007, and a hearing was held on July 12,

2007.  Trial in this action is set to begin on September 17, 2007.

**ANALYSIS**

Summary judgment should be granted where the pleadings, discovery, and affidavits

show "that there is no genuine issue as to any material fact and that the moving party is entitled

to judgment as a matter of law."  FRCP 56(c).  The moving party has the initial burden of

production to demonstrate the absence of any genuine issue of material fact.  *Playboy*

*Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1023–24 (9th Cir. 2004).

Once the moving party has met its initial burden, the nonmoving party must "designate specific

facts showing there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24

(1986).  "If the moving party shows the absence of a genuine issue of material fact, the non-

moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine

issue for trial."  *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (citation

omitted).

1.   **DEFENDANTS' OBJECTIONS TO PLAINTIFFS' EVIDENCE.**

Defendants make several objections to evidence plaintiffs presented in opposition to

their motion to summary judgment.  *First*, defendants object to the deposition testimony of Dr.

Rogers as expert testimony that lacks foundation to the extent that he opines on the ultimate

United States District Court
For the Northern District of California

1   cause and manner of death.  On summary judgment, a testimony by an expert witness must be

2   both admissible at trial and must set forth specific facts that show that there are trial issues of

3   fact.  *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 591–92 (1993); FRCP 56(e).  Under Rule

4   56(e), the expert must back up his or her opinion using specific facts.  To the extent that Dr.

5   Rogers opines on the ultimate cause of death and his opinion thereon, plaintiffs have not made a

6   sufficient showing to qualify him as an expert witness.  Neither side disputes, however, that

7   Rogers performed the autopsy on Ayala. Observations he made during the autopsy are

8   admissible to extent that he is not rendering an opinion on the ultimate cause of Ayala's death.

9   Defendants' motion to strike expert testimony is **GRANTED** as to Rogers' statements on Ayala's

10  cause of death.

11       Defendants also argue that plaintiffs have misrepresented Dr. Rogers' deposition

12  testimony.  In the autopsy report, Dr. Rogers listed the cause of death as "blunt injury to the

13  neck associated with physical exertion and acute cocaine intoxication" (Sarmiento Decl. Exh. 7,

14  Dep. Exh. 4).  It also listed anatomical diagnoses of asphyxia and blunt injuries.  In his

15  deposition, Dr. Rogers noted that he observed certain conditions that he believed consistent

16  with asphyxia.  Defendants also argue that Rogers' testimony contradicts itself, but Rogers

17  never actually testified that asphyxia was the cause of Ayala's death.  He testified only that his

18  observations were consistent with asphyxia, or asphyxial death.  Defendants' objection is

19  **DENIED**.

20       In any event, defendants do not address the issue of the cause of Ayala's death in their

21  motion except to object to plaintiffs' evidence.  Defendants' argument primarily rests on their

22  assertion that the force used was reasonable in these circumstances.  In fact, neither side points

23  to evidence regarding the cause of Ayala's death to eliminate or create a triable issue of fact.

24  That ultimate issue simply does not affect the outcome of this order, nor is it addressed by

25  parties in their briefs.

26       *Second*, defendants object to the declaration of Roger Clark, plaintiffs purported expert

27  on police practices.  Specifically, they argue that Clark gave opinions on medical issues that are

28  outside of his expertise because he was not qualified as a medical expert.  Clark's declaration

9

United States District Court

For the Northern District of California

1    qualifies him as an expert only on police practices and issues.  Defendants' motion to strike

2    testimony is **GRANTED** as to the portions of Clark's declaration in which he gives opinions

3    regarding the progression of asphyxiation and how it develops.

4         Defendants also object to Clark's assertion that "the majority of positional or restraint

5    asphyxia incidents have occurred after physical exertion and struggle" (Sarmiento Decl. Exh. 10

6    ¶ 34).  Clark never identifies what restraint incidents to which he refers in coming to this

7    conclusion.  This statement also will be stricken from his declaration.

8         **2.    EXCESSIVE FORCE.**

9         Plaintiffs' first claim is brought under 42 U.S.C. 1983 and alleges that the officers used

10   excessive force in detaining Ayala.  *First*, defendants argue that under the circumstances, the

11   officers' actions were reasonable.  *Second*, defendants argue that they are entitled to qualified

12   immunity because the rights allegedly violated were not clearly established.

13         **A.    Reasonableness of Officers' Actions.**

14         "Determining whether the force used to effect a particular seizure is reasonable under

15   the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on

16   the individual's Fourth Amendment interests against the countervailing governmental interests

17   at stake."  *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal citations and quotations

18   omitted).  Determining whether the force used was reasonable "requires careful attention to the

19   facts and circumstances of each particular case, including the severity of the crime at issue,

20   whether the suspect poses an immediate threat to the safety of the officers or others, and

21   whether he is actively resisting arrest or attempting to evade arrest by flight."  *Ibid*.  "The

22   reasonableness of a particular use of force must be judged from the perspective of a reasonable

23   officer on the scene, rather than with the 20/20 vision of hindsight . . . ."  *Id*. at 396–97.  "In

24   some cases . . . the availability of alternative methods of capturing or subduing a suspect may be

25   a factor to consider."  *Smith v. City of Hemet*, 349 F.3d 689, 701 (9th Cir. 1994).

26         Turning to the first factor, governmental interests, defendants present evidence that the

27   officers thought that they had probable cause to arrest Ayala either for being under the influence

28   or for being a danger to himself.  Plaintiffs point out that defendants admitted repeatedly that

there was no indication that Ayala had committed any other felonies or misdemeanors, that any other crimes were in progress, or that Ayala had been injured.  The substance of the 911 call from Vargas and Escobar was that Ayala had been banging on the walls and doors of his own and other hotel rooms.  From the deposition testimony, none of the officers had prior dealings with Ayala, and on arrival different officers had varying amounts of information regarding the events.

The most important of the three factors set out in *Graham* is "whether the suspect poses an immediate threat to the safety of the officer[s]or others."  490 U.S. at 396.  Defendants present their own testimony that Ayala was growling and screaming at the officers and resisting their attempts to subdue him.  When they arrived, at least some of the officers testified that they believed that Ayala was high on PCP.  None of the defendants, however, ever testified that Ayala tried to hit them, kick them, or grab their weapons.  Additionally, there were a total of thirteen officers on the scene by the time Kennan applied the carotid hold.  When the carotid restraint was applied, Ayala's hands were cuffed in front of him and his ankles were already bound by the body wrap's ankle strap.  Defendants did testify, however, that Ayala was face down and could still push himself up with his arms.  A reasonable jury could still conclude that the officers had Ayala largely under control and that Ayala did not pose an immediate danger to the officers and the public.

Turning to the third factor in *Graham*, defendants present evidence that Ayala was resisting arrest.  The officers testified that they discussed their plans to subdue Ayala in front of him.  Ayala was completely unresponsive and unaware of what they were doing.  He did not react to the officers' commands.  Cutting against this is the fact that none of the officers ever testified that Ayala attempted to harm them.  Furthermore, it is not clear that Ayala could have escaped, particularly once his hands were handcuffed and his ankles were restrained.  Defendants attempt to argue that near the beginning of the exchange with Ayala, they believed that he could run into the hallway or jump out the window.  This seems logical at that time, but once his hands were handcuffed and several officers were holding him down, the possibility of escape and meaningful resistance seemed much more remote.

11

United States District Court

For the Northern District of California

1    Finally, turning to the availability of other methods, defendants argue that plaintiffs have

2    identified no other methods that could have been used against Ayala.  Defendants argue that

3    distraction blows and handcuffs had not worked, so they made a decision to apply the carotid

4    hold and use the body wrap.  Here, plaintiffs argue that the carotid hold constitutes deadly force

5    that was not warranted in these circumstances.  In *Nava v. City of Dublin*, 121 F.3d 453 (9th

6    Cir. 1997), a district court's grant of a permanent injunction against the California Highway

7    Patrol's use of the carotid hold except where the use of deadly force was justified was

8    overturned because the plaintiff was not entitled to injunctive relief.  The Ninth Circuit did not

9    disturb the trial court's finding that the carotid hold constituted deadly force.  Accordingly,

10   parties disagree on whether the carotid hold constitutes deadly force.  Defendants also have not

11   established that all of the steps that they took during the incident, taken together, were

12   necessary under the circumstances.

13   Defendants assert that plaintiff cannot assert this claim against defendants McNichol,

14   Plank, Perez, Chon, Chetcuti, and McPhillips.  These officers only had limited contact with

15   Ayala during the incident, so defendants assert that they cannot be held liable because they did

16   not contribute to the injury.  This argument carries little weight because the incident likely

17   could not have played out in the same way without them.  Viewing the facts in the light most

18   favorable to plaintiffs these officers contributed to the overall plan to restrain Ayala, that

19   eventually ended in his death.

20   Viewing the facts in the light most favorable to the plaintiffs, a reasonable jury could

21   still conclude that the officers used excessive and deadly force under the *Graham* factors.

22   Accordingly, defendants have not eliminated all triable issues of fact as to whether their actions

23   were reasonable.

24                        **B.    Qualified Immunity.**

25   Defendants next argue that they are entitled to qualified immunity for their actions.  The

26   threshold question in deciding whether officials are entitled to qualified immunity is whether,

27   taken in the light most favorable to the party asserting injury, the facts show that the officer's

28   conduct violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If a

1   violation is established, then the court must ask whether the law forming the basis of the

2   violation was clearly established. *Ibid.* "The relevant, dispositive inquiry in determining

3   whether a right is clearly established is whether it would be clear to a reasonable officer that his

4   conduct was unlawful in the situation he confronted." *Id.* at 208. "If the law did not put the

5   officer on notice that his conduct was unlawful, summary judgment based on qualified

6   immunity is appropriate." *Id.* at 202. Finally, the officers are still entitled to summary

7   judgment if they had a reasonable, though mistaken, view of either the law or the facts. *Id.* at

8   1213.

9           As mentioned above, this order has already established that when viewed in the light

10  most favorable to the Ayalas, the facts could establish that the officers violated Julio A. Ayala's

11  Fourth Amendment rights.

12          The right to be free from excessive force is well-established, so now this order turns to a

13  more specific inquiry of whether it would be clearly established that the degree of force at issue

14  here would violate a suspect's rights. Plaintiffs point to a decision, *Drummond v. City of

15  Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003), in which officers attempted to take a man into

16  custody for evaluation who was in an agitated state due to mental illness. The officers placed

17  weight on Drummond's neck and back and bound his ankles with a hobble restraint. As a

18  result, Drummond suffered cardiopulmonary arrest. *Id.* at 1054–55. The Ninth Circuit held that

19  officers would have been on notice that these actions violated the suspects' rights. *Id.* at 1061.

20          Defendants argue that this case is not sufficiently analogous to the facts alleged here

21  because Ayala was resisting arrest and was not handcuffed behind his back. Still, defendants do

22  not deny that Ayala was unarmed, and never attempted to hit, kick, or take any weapons from

23  the officers, and that the officers applied the carotid hold and a body wrap to subdue him even

24  after his ankles were restrained. Furthermore, the use of the carotid hold except where the

25  suspect poses an immediate threat has been criticized in case law as noted above. The South

26  San Francisco police department additionally had a policy that it was only to be used on

27  dangerous suspects. Accordingly, defendants are not entitled to qualified immunity. Their

28  motion for summary judgment is **DENIED**.

13

United States District Court

For the Northern District of California

1     **3.     FOURTEENTH AMENDMENT.**

2         Plaintiffs' next claim is for interference with their rights to familial relationships under

3     the Fourteenth Amendment.  They argue that defendants' actions deprived them of their

4     substantive due process rights to the companionship and society of their son Julio.

5         In their briefs, plaintiffs point out that on these facts, there was a seizure that implicated

6     decedent's Fourth Amendment rights.  Based on this, plaintiffs contend that this claim should

7     be analyzed under the same standard as the excessive force claim because there is an

8     amendment that explicitly covers the rights at issue.  *See United States v. Lanier*, 520 U.S. 259,

9     272 n.7 (1997).  Plaintiffs also point out that where the deliberate use of excessive force in a

10    seizure resulted in death, the decedent's survivors can litigate the reasonableness of the search.

11    *See, e.g. Tennessee v. Garner*, 471 U.S. 1 (1985); *Broward v. County of Inyo*, 489 U.S. 593

12    (1989).  "Fourth Amendment rights are personal rights which . . . may not be vicariously

13    asserted."  *Alderman v. United States*, 394 U.S. 165, 174 (1969).  Plaintiffs have already

14    asserted their son's excessive force claim on his behalf.  Thus, the only avenue left is for

15    plaintiffs to assert their own Fourteenth Amendment rights, so this claim is judged under

16    substantive due process standards.

17        "[T]he Due Process Clause is violated by executive action only when it can properly be

18    characterized as arbitrary, or conscience shocking, in a constitutional sense."  *Lewis v. County*

19    *of Sacramento*, 523 U.S. 833, 847 (1998).  The Supreme Court has "spoken of the cognizable

20    level of executive abuse of power as that which shocks the conscience."  *Id*. at 846.  It is clear

21    that mere negligence or liability grounded in tort does not meet the standard for a substantive

22    due process violation.  *Id*. at 849.  The *Lewis* decision involved the high-speed pursuit of a

23    suspect on a motorcycle, which ended in a police officer hitting and killing the suspect with a

24    car.  In determining that the police officer's actions did not "shock the conscience," the

25    Supreme Court analogized high-speed car chases to tense, rapidly evolving situations such as

26    prison riots.  The decision then determined that officer liability should be judged on a higher

27    standard than deliberate indifference and should turn on "whether force was applied in a good

28    faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose

**United States District Court**

For the Northern District of California

of causing harm . . . ."  *Id*. at 852–53.  By contrast, the deliberate indifference standard is appropriately used in custodial situations where defendants have more time to make decisions about their actions.

Defendants then urge that this case is analogous to *Lewis* because they were attempting to take Ayala into custody and he was resisting them.  The standard to be applied depends at least in part on whether actual deliberation was practical under the circumstances.  *See Moreland v. City of Las Vegas*, 159 F.3d 365, 372 (9th Cir. 1998).  On these facts, however, it is not clear that the analogy to the car chase in *Lewis* holds up.  It is undisputed that Ayala was resisting at the time Kennan applied the carotid hold, but his hands were cuffed in the front, his ankles were restrained, and there were thirteen police officers present.  In their briefs, defendants maintain that this was a rapidly evolving situation, but in their deposition testimony, the officers stated that they had talked out a plan to restrain Ayala and administer the carotid hold.  This undercuts their current argument that their decisions were made in haste.  Furthermore, the entire incident lasted well over twenty minutes.  Still, this situation is not like the rights of a suspect in custody where deliberate indifference standards would apply.  Accordingly, conduct here that would shock the conscience would be something less than a deliberate purpose of causing harm.

Defendants cite a number of cases that applied *Lewis*' purpose of causing harm standard.  In *Moreland v. Las Vegas Metropolitan Police Department*, 159 F.3d 365, 372–73 (9th Cir. 1998), a police officer shooting the wrong man in a gunfight outside a bar did not constitute a substantive due process violation under the purpose to commit harm standard.  Another similar case applying the purpose to commit harm standard was *Schaefer v. Goch*, 153 F.3d 793, 798 (7th Cir. 1998), where parents of a shooting victim could not prevail on a substantive due process claim against officers who accidentally shot their daughter during a hostage situation.  Both of these decisions described extremely dangerous situations where the suspects were armed and the officers and the public were in danger.  As with *Lewis*, they are not analogous to these facts.

**United States District Court**

For the Northern District of California

1    Under these facts, a reasonable jury could find that defendants' conduct shocked the

2    conscience.  Ayala was resisting, but he was unarmed and at no time did he attempt to kick, hit,

3    or take a weapon from any of the multitude of officers.  Viewing the facts in the light most

4    favorable to plaintiffs, a reasonable jury could still find that defendants' conduct violated the

5    Ayalas' substantive due process rights under the Fourteenth Amendment.  Accordingly,

6    defendants motion for summary judgment is **DENIED**.

7         **4.    SUPERVISORY AND MUNICIPAL LIABILITY.**

8    Municipalities and local governments can be sued directly for violations of

9    constitutional rights under 42 U.S.C. 1983 where government officials were acting pursuant to

10   an official policy or recognized custom.  *Monell v. Dept. of Social Serv. of New York*, 436 U.S.

11   658, 690 (1978).  The plaintiff must identify the policy or custom which caused the violation.

12   "The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was

13   the 'moving force' behind the conduct alleged.  That is, a plaintiff must show that the municipal

14   action was taken with the requisite degree of culpability and must demonstrate a direct causal

15   link between the municipal action and the deprivation of federal rights."  *Bd. of County*

16   *Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original).

17         **A.    Municipal Liability.**

18   "[I]nadequacy of police training may serve as the basis for § 1983 liability only where

19   the failure to train amounts to deliberate indifference to the rights of persons with whom the

20   police come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  Assuming

21   plaintiff has shown that the training received by employees was inadequate, the question then

22   becomes whether inadequate training can be justifiably called municipal policy.  *Id*. at 389–90.

23   To show failure to train, a plaintiff must show that "(1) he was deprived of a constitutional

24   right; (2) the City had a training policy that amounts to deliberate indifference to the

25   constitutional rights of the persons with whom its police officers are likely to come into contact;

26   and (3) his constitutional injury would have been avoided had the City properly trained those

27   officers."  *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. May 8, 2007).

28   "Evidence of the failure to train a single officer is insufficient to establish a municipality's

16

1    deliberate policy" because it does not show that the municipality made a deliberate or conscious

2    choice.  *Id*. at 484–85.

3        Plaintiffs assert that they can establish municipal liability for failure to train on the bases

4    of (1) failure to instruct the officers regarding the proper circumstances in which to use the

5    carotid hold and (2) failure to instruct regarding the dangers of positional asphyxia associated

6    with use of the carotid hold.  In support of the first theory, plaintiffs present Kennan's own

7    deposition in which he stated that he did not recall the last time when he received training in the

8    use of the carotid hold.  Plaintiffs also present evidence that the city of South San Francisco had

9    a written policy, General Order U-01, which limited use of the carotid hold only to combative

10   and dangerous suspects.  Defendants designated Detective Neary as the person most

11   knowledgeable about the practices and training of South San Francisco police officers.  He

12   testified that officers were free to use the carotid restraint at their discretion based on the

13   training they received at the police academy, and nothing more.  Plaintiffs also point out that

14   Detective Neary believed that positional asphyxia was a theory, and that the police department

15   did not train its officers about the risks associated with it in using the carotid hold.  Plaintiffs

16   then present the declaration of Roger Clark, their expert in police practices, who declares that

17   failure to train regarding positional asphyxia constitutes deliberate indifference to the rights of

18   detainees.

19       Plaintiffs have not come forward with evidence that the failure to train was part of a

20   pattern or practice.  At most, they have merely shown that Kennan lacked training in using the

21   carotid hold.  As to Detective Neary's testimony, it only says that officers could use their

22   discretion in using the carotid hold; it does not indicate some sort of widespread pattern of a

23   failure to train the officers.  Plaintiffs can point to no similar incidents involving the use of the

24   carotid hold.  Similarly, with positional asphyxia, plaintiffs have found no other incidents

25   related to the alleged failure to train.  Viewing the facts in the light most favorable to plaintiffs,

26   defendants have shown that there are no remaining triable issues of fact as to whether there was

27   a pattern or practice that was the moving force behind Ayala's injuries.  Accordingly,

28   defendants' motion for summary judgment is **GRANTED**.

**B.      Supervisory Liability.**

Plaintiffs claim that the City of South San Francisco, Chief of Police Rafaelli, and Sergeant Carlino should be held liable under a theory of supervisory liability.  Supervisory liability may be imposed for a supervisor's own culpable action or inaction in training, supervising, or controlling subordinates, acquiescence in the constitutional violations that for the basis of the complaint, or conduct showing a reckless or callous indifference to the rights of others.  *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991).  The harm must also be attributable to an official policy or custom.  *Id*. at 645.  For instance, a police chief could be held liable in his supervisory capacity where he had ignored three prior excessive force complaints against the officer whose conduct was at issue.  *Blankenhorn*, 485 F.3d at 485.

Plaintiffs first argue that Carlino should be held liable because he was directly responsible for all officers on the scene.  This theory is better-suited to direct liability; Carlino was present during the incident and participated in the events.  Defendants' motion for summary judgment on the excessive force and substantive due process claims have already been denied.  Holding him liable on a supervisory liability theory would be duplicative, and plaintiffs have not established that this use of force was part of a custom or practice.

Plaintiffs next argue that Rafaelli and the city of South San Francisco should be held liable on a ratification theory for failing to investigate the incident and failing to discipline those involved.  Defendants present evidence, which plaintiffs do not refute, that there was an investigation by the San Mateo County District Attorney.  All officers participated in the investigation, and the findings of pathologists and criminologists were reviewed.  The results were ultimately turned over to the Ayalas.  Plaintiffs argue that Rafaelli went to the scene of the incident shortly after it happened and failed to interview the officers or conduct an investigation.  They also present evidence that Rafaelli did not retrain or discipline any of the officers because of the incident.  Plaintiffs, however, never deposed Rafaelli.  Plaintiffs have not carried their burden to establish that these actions were part of a practice or policy made by Rafaelli or the city.  Even assuming that Rafaelli's actions were inadequate, plaintiffs have not established that his actions were part of city policy, custom, or procedure.  Accordingly, even

18

1   viewing the evidence in the light most favorable to plaintiffs, they have not shown that there are

2   triable issues of fact remaining as to supervisory liability.  Defendants' motion for summary

3   judgment on this claim is **GRANTED**.

4       **5.      STATE-LAW CLAIMS.**

5       Plaintiffs also bring four state-law claims against defendants.  Defendants move for

6   summary judgment arguing that plaintiffs have failed to show triable issues of fact and that

7   these claims are barred by immunities afforded by the California's Government Tort Liability

8   Act.

9                   **A.      Wrongful Death and Survival Action.**

10      Plaintiffs bring claims for wrongful death under California Code of Civil Procedure

11  § 377.60 and for a survival action under California Code of Civil Procedure § 377.34.  The sum

12  of defendants' argument in support of its motion as to these claims is that the officers' use of

13  force was reasonable, so these claims should fail.  The use of reasonable force under California

14  law is judged under similar standards to those used for federal constitutional claims.  *See, e.g.,*

15  *Martinez v. County of Los Angeles*, 47 Cal. App. 4th 334, 349 (1996).  This order has already

16  determined that defendants have not presented evidence that would entitle them to a directed

17  verdict at trial on the issue of whether their actions were reasonable.  Accordingly, defendants'

18  motion for summary judgment on plaintiffs' wrongful death and survival claims is **DENIED**.

19                  **B.      Negligence and Negligent Hiring, Supervision, and Training.**

20      Plaintiffs allege that defendants City of South San Francisco, Rafaelli, and Carlino are

21  liable for negligent hiring, supervision, and retention.  Plaintiffs also allege a claim for

22  negligence against all defendants.  Under California Government Code § 820.2, "[e]xcept as

23  otherwise provided by statute, a public employee is not liable for an injury resulting from his

24  act or omission where the act or omission was the result of the exercise of the discretion vested

25  in him, whether or not such discretion be abused."  "Immunity is reserved for those basic policy

26  decisions which have been expressly committed to coordinate branches of government, and as

27  to which judicial interference would thus be 'unseemly' . . . . On the other hand . . . there is no

28  basis for immunizing lower-level, or ministerial decisions that merely implement a basic policy

1   already formulated." *Caldwell v. Montoya*, 10 Cal. 4th 972, 981 (1995) (internal citations and

2   quotations omitted).  Police chiefs have power to promulgate rules and policies that are binding

3   on a city.  *Peterson v. City of Long Beach*, 24 Cal. 3d 238, 244 (1979).  Decisions to retain and

4   discipline employees are generally considered discretionary acts.  *See, e.g.*, *Caldwell*, 10 Cal.

5   4th at 984; *Kemmerer v. Fresno County*, 200 Cal. App. 3d 1426, 1439 (1988).

6        Here, plaintiffs' claims for negligence and negligent hiring, supervision and training

7   asserted against the city, Rafaelli, and Carlino, are all predicated on decisions made regarding

8   hiring and retaining employees.  Also, plaintiffs attack the decision not to discipline any of the

9   officers in connection with the incident.  These decisions fall under the rubric of discretionary

10   acts for which government officials have discretionary immunity.  Plaintiffs have also identified

11   no specific policy or failure to train to form the basis of their claims.  Accordingly, defendants'

12   motion for summary judgment is **GRANTED** as to the claims for negligence and negligent hiring,

13   supervision and training against the city, Rafaelli, and Carlino in his official capacity.

14        Plaintiffs' claims for negligence against the remaining defendants survive as defendants

15   merely repeat their arguments is that the use of force was reasonable.  As detailed above, there

16   are triable issues of fact remaining as to whether that was the case.  Defendants' motion for

17   summary judgment on plaintiffs' negligence claim is **DENIED** with respect to all other

18   defendants.

19                    **C.    Assault and Battery.**

20        To prevail on a claim for battery against a police officer, the plaintiff must establish that

21   the officer used excessive force against him or her.  *Edson v. City of Anaheim*, 63 Cal. App. 4th

22   1269, 1273 (1998).  California law uses the same standard of reasonableness as is used under

23   the Fourth Amendment.  *See Saman v. Robbins*, 173 F.3d 1150, 1157 n.6 (9th Cir. 1999).  As

24   described above, on these facts, a reasonable jury could conclude that the amount of force the

25   officers used was not reasonable under the circumstances.  Accordingly, summary judgment on

26   this claim is not appropriate, and defendants' motion for summary judgment is **DENIED** as to the

27   claim for battery.

28

### D.      Immunity Under California's Government Tort Liability Act.

Finally, defendants contend that they have immunity for all of plaintiffs' state-law claims.  Two code sections govern the scope of public officers' liability for common-law torts under California law.  *First*, California Government Code § 815.2(a) provides:

> A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative.

*Second*, California Government Code § 820(a) provides that "[e]xcept as otherwise provided by statute . . . a public employee is liable for injury caused by his act or omission to the same extent as a private person."  Accordingly, the California Court of Appeal has explained that this statutory framework establishes two principles:

> (1) unless they are granted specific statutory immunity, a public entity and its employees are liable in tort for the same causes of action that could be brought against a private person; and
> (2) absent a statute specifically imposing liability, a public entity and its employees are not liable for causes of action in tort that could not be pursued against a private party.

*Lueter v. California*, 94 Cal. App. 4th 1285, 1300 (2002).  Furthermore, "California law denies immunity to police officers who use excessive force in arresting a suspect."  *Robinson v. Solano County*, 278 F.3d 1007, 1016 (9th Cir. 2002) (en banc).

"Direct tort liability of public entities must be based on a specific statute declaring them to be liable, or at least creating some specific duty of care . . . ."  *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1112 (2004).  Plaintiffs have identified statutes and duties that they claim the defendants' breached, including assault and battery, wrongful death, and negligence.  Accordingly, defendants' arguments that plaintiffs have pointed to no duty simply fail.  Defendants' motion for summary judgment is **DENIED** as to plaintiffs' state-law claims.

### CONCLUSION

For all of the above-stated reasons, defendants' motion for summary judgment is **DENIED** as to plaintiff's claims under Section 1983 based on the Fourth and Fourteenth Amendments and plaintiff's state-law claims for wrongful death, assault and battery, and negligence.  Defendants' motion is **GRANTED** as to plaintiffs' claims under Section 1983 for

supervisory and municipal liability and plaintiffs' state-law claims for negligence and negligent

hiring, training, and supervision against the City of South San Francisco, Carlino, and Rafaelli.

No claims remain against Rafaelli and the City of South San Francisco, thus they are

**DISMISSED** from this action.

        **IT IS SO ORDERED.**

Dated:  July 13, 2007.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court

For the Northern District of California

22